

FILED
COURT OF COMMON PLEAS
2006 NOV 21 AM 10: 57
DAN FOLEY
CLERK OF COURTS
MONTGOMERY CO., OHIO

**COURT OF COMMON PLEAS**
**MONTGOMERY COUNTY, OHIO**

| | | |
|---|---|---|
| **DIANA FUGATE**<br>2222 Bushnell Avenue<br>Dayton, OH 45404<br><br>Plaintiff<br><br>vs.<br><br>**A-LAB CORP**<br>3050 Dryden Road<br>Dayton, Ohio 45439<br><br>and<br><br>**JOHN GRAY**<br>1911 Ridgeway Road<br>Dayton, Ohio 45419<br><br>Defendants | : | **CASE NO.** 06-919<br><br>**Judge**<br><br>**COMPLAINT AND**<br>**JURY DEMAND** |

1. This is an action for sexual harassment and retaliation for reporting and opposing sexual harassment in violation of Title VII of the 1964 Civil Rights Act, as amended in 1991, 42 USC § 2000e et seq., and Ohio law, RC §§ 4112.02 and 4112.99. This is also an action for retaliatory discharge in violation of the public policy of Ohio. This is also an action for defamation and/or conspiracy to defame Plaintiff.

2. Plaintiff Diana Fugate is an individual residing in Montgomery County Ohio. She is a former employee of Defendant A-Lab Corp.

3. Defendant A-Lab Corp is a corporation incorporated in the state of Ohio with its principal place of business in Montgomery County Ohio. Defendant A-Lab Corp is one of a group of related corporations owned principally by Defendant John Gray and his brother. A-Lab manufactures parts for use in automobiles and airplanes.

4. Defendant John Gray is the principal owner of Defendant A-Lab Corp and closely related corporations. He is an individual who resides in Montgomery County Ohio. Defendant Gray was the main decision-maker in the decision to terminate Plaintiff from employment and/or he ratified the decision to terminate.

5. Plaintiff is a 36 year old college graduate. She was a loyal, dedicated, and excellent employee of Defendant A-Lab from September 15, 2003 until she was unlawfully terminated on January 10, 2006. She received good evaluations.

6. Plaintiff served as the only Quality Manager for Defendant A-Lab. Although her title included the word "manager" she did not supervise any employees. She was paid at an hourly rate. Her duties included ensuring that the quality system was maintained according to internal, customer, and industry standards. She reviewed procedures through internal audits and utilized a corrective action system to report areas of non-compliance. She tracked gauge calibrations and maintained quality records. She performed these duties for A-Lab and sister corporation Ward Steel. Her duties were vital for ensuring the quality of parts that were sold to customers for use in automobiles and airplanes.

7. Starting in the Spring of 2005, Defendant A-Lab needed help in the NDT department to inspect parts. Plaintiff agreed to assist in the department and worked long hours to help them stay caught up with demand.

8. During her time in the NDT department, Plaintiff began to experience a pattern of sexual harassment from a co-worker. The harassment included unwelcome comments about her anatomy, innuendo about having sexual relations with her, and positioning himself close to Plaintiff. This behavior was unwelcome and she expressed her dislike of it to the co-worker, but it did not stop. Thus, Plaintiff approached the supervisor of NDT, Mike Williams, in June or July 2005 to complain about the harassment.

9. The company had an employee manual containing a section on sexual harassment. The policy told employees to take sexual harassment problems to their supervisors. It stated: "Employees who have complaints of sexual or racial harassment should, in appropriate circumstances, report such conduct to their supervisors." It further stated: "Complaints will be treated confidentially and will be investigated thoroughly in as reasonable a time period as is possible given our business needs."

10. Despite the clear wording of the policy, supervisor Williams refused to investigate Plaintiff's complaints or do anything further. In fact, he responded to her rudely stating, "you expect me to fire one of my better techs on your word." Plaintiff responded that she did not expect him to be fired, but that she wanted the harassing conduct to stop. Williams told her that she would need to bring him "concrete proof." He did nothing further at the time and the harassment continued for months.

11. The harasser was a felon and had served time in prison for gross sexual imposition. The company was well aware of his criminal past.

12. On November 8, 2005, Plaintiff received a text message on her cell phone from the harassing employee that stated: "Thought I would get this out of the way first, you have a great ass." The same day the company was giving a sexual harassment class in the building. After the class, Plaintiff tried to get in contact with the human resource representative, Jodi Bruner, several times. Ms. Bruner did not return Plaintiff's call or come to her office as requested. Later that day, Plaintiff reminded John Williams of his comments from June or July and showed him the text message on her phone. He immediately took the phone, went back to his department and got the harasser, and brought him to the office of the Vice President and General Manager. They met for about one hour.

13. In the mean time, Plaintiff had not even been permitted to tell her story. Plaintiff began to break down emotionally in front of a secretary who, in turn, had to almost force the HR head Ms. Bruner to come to Plaintiff's office. Ms. Bruner was cold and defensive. Plaintiff expressed concern that she had not even been given the opportunity to tell her story. Ms. Bruner would not meet with Plaintiff and asked her rudely what she expected when she brought forth this problem at 3 o'clock in the afternoon. (Plaintiff had contacted her about 1pm).

14. The next morning, Ms. Bruner again did not want to meet with Plaintiff, but asked her for written examples. Ms. Bruner was again rude, this time asking why yesterday was the opportune time to bring up the harassment matter, as if it were some plot on Plaintiff's part.

15. That same day, Plaintiff was already hearing from co-workers that the harasser was telling them to "watch your back around Diana" and that he was going to

retaliate. Soon after Plaintiff's complaint, the harasser got a tattoo on his body that said "trust no one."

16. The next day, November 10, Plaintiff reported the "watch your back" comment to Ms. Bruner. Plaintiff also expressed concern over the workplace environment now that the complaint had been raised. Plaintiff also stated she felt like she was being attacked every time she spoke to Ms. Bruner and that Ms. Bruner was defending the harasser. Ms. Bruner responded with coldness and sharp retorts. Ms. Bruner stated that she had time that afternoon to devote to investigation, but she still did not sit down with Plaintiff to hear her story. Ms. Bruner failed in her investigation to talk to some of the witnesses that Plaintiff had named.

17. The next day, November 11, management began to retaliate. Plaintiff met with her regular manager, Courtney Schum. Plaintiff showed him some papers relevant to a reorganization they had been working on. Contrary to his normal practice, Mr. Schum threw the papers back at Plaintiff and told her to "leave it alone." Also, the same day John Williams removed one of Plaintiff's work responsibilities because the harassing employee was "pissed" and did not want to work with her.

18. Finally, at 3 p.m. that day, Plaintiff was given a partial opportunity to tell her story to human resources. They met for 15 minutes. Plaintiff talked about the harassment. She stated that she wanted the harassment to stop, for the harasser to apologize, and for her to suffer no negative repercussions. She also told them that the "investigation" process made her feel attacked, made her feel that her employment was at risk, and made her feel as if she had done something wrong.

19. At 4 p.m. that day, Ms. Bruner and the harasser showed up in Plaintiff's office. In the meeting, Ms. Bruner allowed the harasser to put forth lies with impunity.

He stated that Plaintiff should have come to him and that he did not think she was serious when she told him to stop the harassment. Ms. Bruner asked him, "can you please make sure you don't make comments to her anymore?" His response was totally inappropriate. He looked at Plaintiff with a grin and he stated, "yeah, but it's funner [sic] that way." Ms. Bruner did not correct him or discipline him. She simply asked him to leave because the conversation was over from her perspective. After he left, Plaintiff stated to Ms. Bruner that the harasser still did not understand that Plaintiff was serious about this matter. Ms. Bruner's response was to castigate Plaintiff for an alleged sexual comment that Plaintiff was purported to have made.

20. Plaintiff was not informed of any result of the investigation or of any discipline of the harasser beyond the apology. She was not told she would not be retaliated against.

21. On November 15, the harasser instructed other workers not to give work to Plaintiff that was part of her normal job. Plaintiff went to management about it. They reported nothing back to her about corrective action of the harasser.

22. Supervisor John Williams instructed several of his employees not to talk to Plaintiff at all. In addition, Ms. Bruner, Mr. Schum, and Mr. Williams lied to the harasser and stated that Plaintiff was out for blood and wanted him fired. These actions contributed to a negative environment in the workplace. For the next two months until her termination, Plaintiff was shunned by management and others in the workforce. The atmosphere was oppressive and made it extremely difficult to perform her job. Plaintiff suffered great emotional distress.

23. Shortly after the November harassment complaint, A-Lab began preparing for an audit by NADCAP. NADCAP is a third-party certifying agency whose certification

is essential in order for Defendant A-Lab's customers to purchase its products. NADCAP certifies manufacturing processes for the aerospace industry. NADCAP's audit would involve parts that would be used in airplanes.

24. As part of her job functions, Plaintiff noticed that certain daily, weekly, and monthly system checks were not recorded in the log, as required by NADCAP. Plaintiff noted this in her audit report. Vice President Courtney Schum instructed Plaintiff to re-write (i.e. falsify) the audit report or else NADCAP could pull their certification. Supervisor John Williams also asked Plaintiff to "pencil whip" (i.e. falsify) records related to oven calibrations, penetrameters, and step wedges. Plaintiff refused to falsify the records. Plaintiff was also told never to let the auditors know about the "back lab," an area at the company that was kept a secret.

25. On January 10, 2006, Vice President Schum and Supervisor Williams approached Plaintiff. Earlier in the day as part of her job, Plaintiff had been asking questions of people in the NDT department about part verifications. Mr. Schum attacked her verbally stating that she was out to ruin the lab and he could not trust her. He also stated that he could not trust her concerning the upcoming NADCAP audit for fear she would "let something out." Mr. Schum screamed in her face, "I run the goddamn lab" and told her he started the lab.

26. At about 4:30 p.m. the same day, Mr. Schum and Ms. Bruner approached Plaintiff and told her she was terminated because she was putting the integrity of the lab on the line. They refused to explain further. Plaintiff asked if she could have a minute to compose herself. They refused and escorted her out of the building immediately.

27. On January 9 or 10, managers of Defendant A-Lab approached two employees and told them to sign statements that were false or out of context in order to

attempt to justify the termination of Plaintiff. Management threatened the jobs of these employees if they did not sign the statements.

28. Soon after the termination, Plaintiff filed a Charge of Discrimination with the Ohio Civil Rights Commission (OCRC) alleging sexual harassment and retaliation. Plaintiff has since received a notice of right to sue from the Equal Employment Opportunity Commission (EEOC) based on this charge.

29. In response to this charge of discrimination, the company's attorney interviewed certain employees, took affidavits from them, and filed a position statement in response to the OCRC.

30. The harasser was one of the employees called to meet with the company lawyer. Before the meeting occurred, company owner Defendant John Gray met with the harasser. He asked the harasser to falsely tell the lawyer that he had had an extra-marital affair with Plaintiff. He threatened the harasser if he did not tell this lie. Defendant Gray knew this statement was false, yet coerced the harasser to state it anyway knowing that it would become part of an affidavit to the OCRC.

31. The harasser, in turn, falsely told the company lawyer and Ms. Bruner that he had an affair with Plaintiff along with other untruths.

32. After the affidavit was prepared by legal counsel, the harasser was hesitant to sign it.

33. Defendant Gray, Vice President Schum, and supervisor Williams met with harasser. In order to coerce him to sign the statement, they threatened to report him for a parole violation and have him sent back to prison. They also offered him money of between $2,500 and $10,000 to sign the statement because that would allegedly be

cheaper than defending a lawsuit. Defendant Gray also asked the harasser if he would go over to Plaintiff's house and attempt to take pictures of her naked.

34. The harasser ended up signing the false affidavit on March 31, 2006. However, on April 3, 2006, the harasser recanted and sent an email to the company's attorney with a "carbon copy" to Vice-President Schum stating:

> This is [the harasser's name], I am sending you this to let you know that everything that I signed on March 31, 2006 was signed under diress. [sic] I felt & presently feel my future is in jeperdy [sic] by John Williams and John Gray. I was on my way home when John Williams called me back to the lab under false pretenses, and then I was cornered by management and pressured into signing the paper that I signed. Fred Printz was the notary [sic] and he can atest [sic] to the fact that I was aggitated [sic] and do [sic] not want to sign the paper. I did not even read the paper, Jodi Brunner can atest [sic] to that.

35. Despite this communication, the affidavit was submitted to the OCRC by the company by letter dated May 12, 2006, some thirty days after they became aware that the affidavit was faulty.

**COUNT I**
**(Title VII Sexual Harassment)**

36. The above acts of sexual harassment, along with the company's failure to address the problem, and the company's exacerbation of the problem created a hostile work environment for Plaintiff that changed the conditions of her work and made it much more difficult to do her job. The harassment was unwelcome and was subjectively and objectively harassing. The harassment was severe and pervasive.

37. These actions constitute sexual harassment by Defendant A-Lab, a form of sex discrimination prohibited under 42 USC § 2000e et seq.

38. The harassment was known or should have been known by Defendant A-Lab and it failed to take prompt or effective remedial action. Defendant A-Lab failed to take appropriate steps to prevent or correct the harassment.

39. By its actions, Defendant A-Lab ratified the harassment.

40. Defendant A-Lab acted knowingly or in reckless disregard of Plaintiff's federally protected rights.

**COUNT II**
**(Ohio sexual harassment)**

41. The above acts and omissions that constitute sexual harassment under federal law, also constitute sexual harassment under state law, by Defendant A-Lab, in violation of RC §§ 4112.02 and 4112.99.

42. Defendant acted with malice and in conscious disregard of Plaintiff's rights and safety.

**COUNT III**
**(Title VII retaliation)**

43. Defendant A-Lab retaliated against and ultimately terminated Plaintiff for complaining about and opposing sexual harassment in the workplace in violation of 42 USC § 2000e et seq.

44. Defendant A-Lab does not have a legitimate reason for terminating Plaintiff or its reason is false and pretextual.

45. Defendant A-Lab acted knowingly or in reckless disregard of Plaintiff's federally protected rights.

**COUNT IV**
**(Ohio retaliation)**

46. Defendant A-Lab and Defendant Gray, jointly or severally, retaliated against and ultimately terminated Plaintiff for complaining about and opposing sexual harassment in the workplace in violation of RC §§ 4112.02(I) and 4112.99.

47. Defendants do not have a legitimate reason for terminating Plaintiff or their reason is false and pretextual.

48. Defendants acted with malice and in conscious disregard of Plaintiff's rights and safety.

**COUNT V**
**(Wrongful discharge under Ohio public policy)**

49. Defendants A-Lab and Gray, jointly or severally, violated Ohio public policy in terminating Plaintiff for opposing attempts to falsify records and for fear that she would expose company problems in an upcoming NADCAP audit that would hurt Defendants' interests. The public policy draws its support from consumer safety statutes, the regulation of the automotive and airline industry, the policy in favor of air travel and the safety of air travel, and common law and statutory fraud.

50. Defendants do not have a legitimate reason for terminating Plaintiff or their reason is false and pretextual. Defendants do not have an overriding legitimate business reason for terminating Plaintiff.

51. Defendants acted with malice and in conscious disregard of Plaintiff's rights and safety.

**COUNT VI**
**(defamation and/or conspiracy to defame)**

52. Defendants A-Lab and Gray, alone or in concert with each other and others, coerced a third party to make false oral and written statements about Plaintiff to third parties including but not limited to the false allegation that she was engaged in an extra-marital affair. Defendants republished the statement by submitting it, as if truthful, to the OCRC. Defendants were at least negligent in doing so. Defendants' actions constitute the tort of defamation and/or conspiracy to defame under Ohio law.

53. Defendants knew or showed reckless disregard for the truth or falsity of the matter.

54. Defendants acted with malice and in conscious disregard of Plaintiff's rights and safety.

55. As a result of the foregoing violations of the law by Defendants, Plaintiff has suffered loss of income, benefits, other economic damages and emotional distress and harm to reputation.

56. WHEREFORE, Plaintiff prays this Court to award damages far in excess of $25,000.00 and remedies as follows:

a. back pay and lost fringe benefits;

b. front pay and lost fringe benefits;

c. emotional distress and loss of reputation damages;

d. punitive damages;

e. prejudgment interest;

f. lump sum tax differential damages;

g. attorney fees; costs; and expenses of the action;

h. all other relief the Court deems appropriate.

Respectfully submitted,

David D. Kammer--0061808
Tobias, Kraus & Torchia
911 Mercantile Library Bldg.
414 Walnut Street
Cincinnati, Ohio 45202
(513) 241-8137
(513) 241-7863 (fax)
davek@tktlaw.com
Attorney for Plaintiff

**Jury Demand**

Plaintiff requests a trial by jury on all issue triable to a jury.

David D. Kammer--0061808